Filed 6/2/25  P. v. Williams CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B329593 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA449606) |
| v. | |
| JENELLE WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge. Affirmed.

California Appellate Project, Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy

Attorney General, David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \*

## I. INTRODUCTION

Defendant and appellant Jenelle Williams and her co-defendant David Bean were each charged with four murders occurring at different locations within a time span of two weeks in the summer of 2016. The same gun was used in all four murders. Other crimes and enhancements related to the same incidents, as well as priors, were also alleged.

Williams and Bean were tried together by the same jury in 2023, after Williams's two motions to sever were denied. Williams was convicted of second degree malice murder, first degree felony murder, and first degree malice murder, with various enhancements and special circumstances found true. She was acquitted of the remaining murder charge and an assault charge was dismissed after the jury hung and the court declared a mistrial as to that count. She was also convicted of three counts of being a felon in possession of a firearm. She admitted her single prior strike and serious felony conviction.

Williams was sentenced to two consecutive terms of life without parole for two of the murders, plus an indeterminate and aggregate term of 55 years to life for the third, plus an additional aggregate determinate term of six years and eight months for the three gun-possession counts, all imposed consecutively. The court imposed but stayed—as opposed to striking—additional five-year punishment for her prior strike conviction under Penal

2

Code section 667, subdivision (a)(1) on two of the murder counts (1 and 4).[1]

On appeal, Williams contends the trial court abused its discretion in denying severance; erred by allowing autopsy testimony as to two murders by a pathologist who did not personally conduct those autopsies and who relied on testimonial hearsay in rendering his opinions; committed instructional error in that CALCRIM No. 540B concerning felony murder is deficient in addressing the proper legal standard for a finding of reckless indifference to human life for one not the actual killer; and gave an unauthorized sentence by imposing but staying—rather than striking—punishment for the five-year enhancements under section 667, subdivision (a) attached to two of the three murder counts.[2] She also claims the abstract of judgment requires correction to reflect the court's actual oral pronouncement of sentence as the court did not impose and stay the $10,000 parole revocation fund fine under section 1202.45 reflected on the abstract, Williams having received two sentences of life without parole.[3]

---

[1] Further unspecified statutory references are to the Penal Code.

[2] The parties have proceeded on appeal as though the trial court likewise imposed but stayed the section 667, subdivision (a)(1) five-year enhancement as to count 8 for the murder of Tiffany Doxy, discussed below at section III.D. But the court did not orally address this issue at all at sentencing and neither imposed additional punishment for this enhancement on this count nor struck it.

[3] Bean also appealed from the judgment but he is not a party to this appeal. His appeal is pending before us in case number B334652.

The People as respondent concede the last two issues and we accept the concessions. We will strike the five-year enhancements imposed but stayed under section 667, subdivision (a)(1) with respect to the murder counts 1 and 4, and direct the trial court on remand to correct the abstract of judgment as to the erroneous $10,000 parole revocation fine. We reject Williams's first three claims, or find them forfeited, and otherwise affirm the judgment.

## II.  BACKGROUND

A.  *Factual Background*[4]

1.  <u>Williams and Bean—General Background</u>

Co-defendant Bean was a documented Eight-Trey gang member. He admitted prior convictions for grand theft and robbery. Williams, aka "Gigi," was at least an associate of the rival gang known as the Rollin' 60's, having grown up in that gang's territory. According to her testimony, she had never been "jumped in" to the Rollin' 60's gang and was not a member. Williams admitted to having a prior conviction for assault with a deadly weapon. She also admitted to being a drug addict.

Williams and Bean went to elementary school together and Williams testified she knew Bean "from the streets." By July 2016, according to Williams, they had "possibly" or "probably" become romantically involved and she knew he was an "Eight-Trey Gangster." According to Bean, in July 2016, he and Williams had an exclusive romantic relationship, and at the time of trial in 2023, he still loved her.

According to law enforcement, the Eight-Trey and Rollin' 60's gang rivalry had existed for a long time and was ongoing.

---

[4]  We take the facts from the trial evidence.

4

Although dating across gang lines was not common, it did occur. According to Bean, the Rollin' 60's gang had "[put] a hit" out on him because he was dating Williams, who was at least, he acknowledged, an associate of the Rollin' 60's gang and he was therefore not supposed to be dating her.

2.    July 29, 2016 Murder of Marcus Wilkerson (Ct.1)

On July 29, 2016, just before 5:00 a.m., residents of the area of Gage and Western Avenues in Los Angeles heard voices and a gunshot outside and called 911. One witness heard a man's voice say something to the effect of, "Is this how it's going to be?" or "I can't believe you're doing this to me" or "Is it going to end this way?" followed by a gun shot. Approximately an hour later, a pedestrian discovered Wilkerson's body behind a parked car and called 911. When police arrived, they located the body, and next to it a spent .45 caliber bullet casing, branded Federal. Paramedics arrived and determined that Wilkerson was dead. An autopsy later determined he had a visible gunshot wound to his right upper thigh near his groin, which had resulted in extensive blood loss and ultimately his death by homicide.

Law enforcement investigation revealed that Williams had previously been in a romantic relationship with Wilkerson and she was angry with him for having been with another woman, L.S., whom Williams had previously threatened. According to L.S., she knew Williams as "Gigi," a self-admitted member of the Rollin' 60's gang, and the two had been friendly at one time. L.S. said that Williams had once said to her, "You f'ing with my man" and "Bitch, I'll kill both y'all," along with "If I can't have him, no one can." According to L.S., Wilkerson had told her that he feared Williams and had said to L.S. that Williams would "be the death of" him.

5

Williams had also threatened a woman who had had frequent interactions with Wilkerson while the woman was at work at the Jack-in-the-Box near where he was killed. The woman gave him free food and paid him to wash her car until one time when he drove the car away without her permission and she reported it stolen. Williams threatened the woman by telephone—from a number later connected to Williams—over dropping the charges and about repaying Williams for Wilkerson's bail she had posted. The woman provided police with video footage taken from the parking lot of the Jack-in-the-Box in the weeks after Wilkerson's murder. It showed Williams getting out of a black Chevrolet Malibu registered to Bean. This was the first connection law enforcement made between Williams, Bean's car, and Wilkerson's murder. Bean and Williams were seen together in that car at other locations in this period.

Williams acknowledged in her testimony being "close friends" with Wilkerson but denied having been romantically connected with him or having any involvement in his death. She said she had lied when she previously told law enforcement that Wilkerson was her boyfriend and had done so because she was high on drugs. She had bailed Wilkerson out of jail because they were friends but had done the same for many people. Williams said that at 4:45 a.m., some 15 minutes before Wilkerson was killed, she was driving around in Bean's car, which she said she had borrowed after he spent the night with another woman. According to Williams, she was looking for Wilkerson because he had a court appearance that day and had not signed his bail paperwork. She could not find him but, according to her, this explained why her cell phone pinged off cell-phone towers near the Wilkerson murder location.

Williams acknowledged knowing the other woman involved with Wilkerson, L.S., "from the streets" but denied any reason to be jealous of L.S.'s relationship with him. L.S. had heard the gunshot that killed Wilkerson and she went to the scene shortly after and spoke with law enforcement about the crime. Williams testified that L.S. had told her of Wilkerson's death, and Williams denied ever having threatened L.S. about her relationship with Wilkerson or her interaction with law enforcement about his murder.

L.S. testified that after she spoke with law enforcement at the scene about Wilkerson's murder, Williams threatened her for cooperating with police, this time while possessing a gun. According to L.S., Williams told people near her to move out of the way and L.S. believed Williams was going to kill her. Bean was then with Williams and he also threatened L.S. for her cooperation with law enforcement in investigating Wilkerson's death, saying to her, "[H]ear me good. Get my fucking name out your fucking mouth." Bean testified that Williams had never mentioned to him having seen Wilkerson with another woman or being angry with him.

The day after Wilkerson's death, Williams called his sister from phone number 323-453-7617 to offer condolences. Williams acknowledged using this phone number and cell phone records tied to this number placed her at the murder scene when Wilkerson was determined to have been shot. Wilkerson's sister said she frequently spoke with him over the phone and that his girlfriend, "Gigi," was often on the line interrupting the call. Gigi was a jealous person, according to the sister, and often complained to her about Wilkerson's sexual involvement with other women.

7

A bullet fragment taken from Wilkerson's body was too small and damaged to be forensically connected to a particular gun. But the casing found at the scene was later connected to the gun used in all four murders. Williams testified she had bought the gun used to kill Wilkerson a few days after his murder, on August 1st or 2nd. But when confronted with Bean's testimony that he had bought the gun on August 3, 2016, and that it was his, Williams testified they had bought the gun together. She said a man had walked up to Bean's car where they were sitting and offered to sell them the gun, and she paid for it with her money.

Bean testified that he knew Wilkerson as they had "smoke[d]" together and that there was no animosity between them. He denied killing Wilkerson, having been present when Wilkerson was shot, having helped anyone get away after the killing, or knowing who killed him. Bean said he knew L.S. enough to say hello and acknowledged having asked her why she had his name "in [her] mouth" about Wilkerson's death when he had nothing to do with that. Bean said he did not recall specifically threatening L.S., but if he did, he did not recall Williams being with him at the time.

Bean told a detective investigating the Wilkerson murder that he had been by himself at a 24-hour "smoke shop" that night in the same area where Wilkerson was killed. But, to his surprise, he saw Williams immediately after when he left the smoke shop and drove to a nearby clinic. Bean then drove Williams to her motel room where she was living. He said he left her room after about 10 minutes and had sex with another woman at the same motel. He saw Williams the next morning at

around 10:00 a.m. and did not know her whereabouts in the interim.

Cell phone data showed the phone number associated with Williams had been near the Wilkerson murder scene both before the killing and for about a half hour after.

3.     <u>August 9, 2016 Murder of Shawn Pryor (Ct.4)</u>

On August 9, 2016, Shawn Pryor and his wife, Sandra Pryor, were staying in a motel in Inglewood.  Surveillance video from the motel captured Bean, Williams, and a female identified as Tiffany Doxy entering the motel at approximately 2:39 a.m. and proceeding towards the room on the second floor where the Pryors were staying.  Williams and Doxy went to the door and knocked, while Bean held back down the hallway.  The Pryors heard the knock. When Shawn Pryor asked who it was, a voice responded that it was "Tiffany."  Sandra Pryor went into the bathroom to dress while Shawn Pryor opened the door.  Doxy was at the door, standing with another woman, identified as Williams.  Surveillance video showed Doxy and Williams at the room at around 2:40 a.m.  Bean was still holding back down the hall, beyond view from inside the room.

Once Shawn Pryor opened the door, Doxy went inside and asked him for some money and then Doxy left the room. Surveillance video showed her briefly speak to Bean on her way out.  He was outside the door at that point. Sandra Pryor came out of the bathroom just as Doxy was leaving.  Williams came into the room, ostensibly to buy drugs from Shawn Pryor but using counterfeit bills, which he discovered after giving her change for the purchase.  Surveillance video from outside the room showed Bean arriving at the room doorstep and stepping into the doorway while Williams was inside.  According to Sandra

9

Pryor, Bean stood in the open doorway with a gun and said to Shawn Pryor something to the effect of, "You know what this is. Give me your money. I want everything." When this happened, Pryor threw money he had in his hands on the floor. And he told Sandra Pryor to shut the door. Williams, from inside, "pushed" Sandra Pryor into the wall at the corner of the room behind the door and said, "Don't try it. Don't move. Don't say nothing." Sandra Pryor also heard Williams say at one point, "Tiffany set this up. It was Tiffany," meaning Doxy.

The Pryors together worked to close the door to keep Bean out of the room but Bean fired his gun into the room through the door. Sandra Pryor saw Bean through the crack in the door and then heard gunshots while trying to close it. Surveillance video from outside the room showed Bean with something black in his hand at the door and two bursts of dust or debris coming into the camera view, as if disturbed from the force of a gun firing.

Shawn Pryor was able to close the door keeping Bean outside the room. He and Williams then engaged in a struggle inside the room and on the bed, during which the camouflage-colored jacket Williams was wearing came off. Sandra Pryor had picked up some of the money her husband had thrown to the ground and put it in her purse. She went to the separate kitchen area of the room to call 911. She heard glass breaking followed by additional gun shots while she was on the 911 call. After the shots, Sandra Pryor saw her husband fall to the floor from the bed, bleeding. Surveillance video showed Bean breaking the room's window from the outside with a gun and pointing the gun inside the room. Sandra Pryor tried to come to the aid of her husband but he was bleeding so profusely that she could not see the gunshot wounds.

Williams left the room but left her jacket inside. It was later turned over to police. Surveillance video showed her leaving the room and then Williams and Bean running away slowly and leaving the motel together. The video showed Williams was not then wearing the jacket she had been wearing when entering the room. Williams acknowledged in her testimony that it was she, Doxy, and Bean in the surveillance video.

At approximately 3:00 a.m., law enforcement responded to the motel shooting. They found Shawn Pryor face down in his room with multiple gunshot wounds and not moving, with Sandra Pryor still present in the room, very upset. Paramedics arrived and assessed Shawn Pryor's condition before taking him away in an ambulance. Law enforcement took photographs of Pryor before he was removed from the room, noting money bills around him and blood in the room and on some of the bills, indicating a physical struggle, according to law enforcement. An autopsy later determined that Shawn Pryor had suffered fatal gunshot wounds to his chest and abdomen. A deformed bullet was lodged in his sacral bone. The shots had been fired from an indeterminate range. The manner of death was homicide.

Investigation revealed a bullet hole in the motel room door and the shattered side window. There were three expended Federal brand .45 caliber bullet casings inside the room—two near the door and one at the bed. A forensics specialist collected the bullet casings and Williams's jacket, which had a narcotics pipe and a lighter in the pocket. There were also some counterfeit bills inside the jacket as well as in Sandra Pryor's purse. All the counterfeit bills had the same writing on them: "For Motion Picture Use Only." Sandra Pryor had never seen her

11

husband with counterfeit bills before and she did not notice any in the room before Bean and Williams arrived.  DNA from the pipe in Williams's jacket was later matched to her  and DNA from the motel window sill around the shattered window was matched to Bean.

The three casings and two bullets discovered in the motel room were later determined to be from the same gun used in Wilkerson's killing.  The bullet fragment taken from Shawn Pryor's body could not be either positively matched or excluded from use by the same gun.

According to Williams's testimony, she, Bean, and Doxy went to the motel to buy cocaine from Shawn Pryor.  She had never met Doxy before and didn't know Bean had a gun on him or that a gun would be used.  After Doxy left the motel room, Williams asked Pryor for $30 worth of cocaine and gave him one of three counterfeit $50 bills she was carrying.  Pryor gave her the cocaine and $20 in change.  Pryor noticed the $50 bill did not look right and he confronted Williams as she was leaving the room.  She denied the bill was counterfeit and he yanked her back into the room, telling his wife to "go get the thing" because "this bitch is trying to play me."  Williams screamed and Bean then appeared at the motel room door, stepped into the room, and asked what was happening.  Williams responded that Pryor was upset about the money.  Williams denied pushing Sandra Pryor behind the door.  According to Williams, Pryor grabbed her arm and pulled her back and they started fighting while someone closed the door on Bean.  Williams left the room after Bean fired the gun through the window.  Williams said she had no intention of robbing Pryor or committing a burglary when she entered the

room and that she wanted only to buy drugs from him using the counterfeit money.

In his testimony, Bean admitted having shot Shawn Pryor but claimed he acted in defense of Williams.  He said he, Williams, and Doxy had gone to the motel to buy cocaine from someone Doxy knew.  When they arrived, Doxy told him to hang back while she approached the dealer.  Doxy and Williams went to the door of the motel room.  After he felt too much time had passed, Bean went to the room and saw Shawn Pryor trying to prevent Williams from leaving.  Bean said he heard Pryor say to Williams, "You ain't fittin' to leave. Here you trying to play games," referring to the counterfeit money.  Pryor grabbed the change back out of Williams's hand and pulled her back into the room.  According to Bean, Pryor fired a shot at him while struggling with Williams and before slamming the door on Bean.  Bean always kept a gun on him for protection and he used it to fire a shot back at Pryor through the door.  Bean then broke the motel-room window and fired two more shots into the room. Bean said he fired the shots to "d[if]fuse the situation," intending to allow Williams the opportunity to leave the room and escape. Williams ran out of the room and they fled the motel.

According to Bean, they went to the home of his friend, Jeffrey Burton, known as "Doughboy," and Bean took a shower because of his bleeding hand that had been cut when he broke the motel-room window.  Doxy drove herself somewhere else.  Bean left his gun in his car parked at Burton's house and his car keys on a table inside the residence.  Bean could not explain how the gun used in the shooting of Shawn Pryor was also used to kill Doxy some 15 minutes later and he did not know what happened to his gun after he got to Burton's house.

Surveillance video from the motel showed no physical contact or struggle between Shawn Pryor and Williams before Bean was at the door and then stepped inside, appearing to fire the first shot into the motel room.  According to Sandra Pryor, her husband did not have a gun in the room and no forensic evidence supported that Pryor either had or fired a gun.

    4.    <u>August 9, 2016 Murder of Tiffany Doxy (Ct.8)</u>

As shown on surveillance video, approximately 12 minutes after leaving the motel where Pryor had been shot, Williams, Bean, and Doxy arrived about two miles away at a parking lot near a liquor store, Doxy having driven her own Volvo with Williams as a passenger behind what resembles Bean's Chevy Malibu.  That car did not enter the parking lot but turned and waited on the street nearby.  Doxy stopped the Volvo in the parking lot after backing it into an angled parking space, but she left the car running.  Williams then shot her in the face.  Video footage from the nearby liquor store showed a flash of light inside the Volvo consistent with the muzzle flash of a gun being discharged.  Williams got out of the passenger side of the Volvo, wearing clothing that matched Sandra Pryor's description of what Williams had been wearing in the motel room, and went to the nearby car resembling Bean's, which had flashed its headlights, and they drove away.  Immediately after the shot, Doxy's car in reverse struck a wall in the parking lot at a diagonal angle and the car was left running.  There was a .45 caliber spent bullet casing later discovered on the front passenger seat, which was matched to the gun used in all four murders.

Law enforcement initially realized Pryor's and Doxy's murders were connected because Doxy had been at the motel location where Pryor had been shot, the two murders occurred

14

close in time and location, and Doxy was wearing the same clothes in both locations, as seen on video from the motel. An autopsy later revealed that Doxy had stippling on her face, indicating that the gun had been discharged from one to three feet away, consistent with the surveillance video showing the flash of light from inside the car. The bullet to her face was lodged in her neck and she died from the gunshot wound in the manner of homicide. Sandra Pryor identified Doxy from a photograph as the victim of the gunshot and as the person who had earlier come into the Pryors' motel room with Williams.

Williams denied any involvement in or presence at Doxy's murder and suggested that a third party may have committed the crime. Williams said that after she and Bean left the motel where Pryor had been shot, they immediately drove in Bean's car to his friend Burton's house, and it took about 10 minutes to get there. When they got there, Doxy was outside the house in her own car and she did not come into the house. At Burton's request, Williams gave him the keys to Bean's car, where the gun was in the center console. Williams then got into the shower with Bean, so she did not actually see Burton or Doxy leave the house. After Williams got out of the shower at Burton's house, he returned, but Doxy did not.

Williams acknowledged that the surveillance video showed Doxy's Volvo drive into a parking lot near Burton's residence after they left the motel where Pryor was killed. She said that neither she nor Bean were in the car with Doxy. She denied that the person who got out of the Volvo after the muzzle flash was her and further denied having killed Doxy or ever having been in that car.

15

According to Bean's trial testimony, after he and Williams left the motel where Pryor had been shot, they went directly to his friend Burton's house, where he took a shower because his hand was bleeding. He did not mention, but did not deny, that Williams showered with him. Williams never told him she had shot Doxy. He put the gun in his car console after they left the motel, and he left it there. He could not explain how the same gun that killed Pryor was used to shoot Doxy.

5.     August 13, 2016 Murder of Kenyada Thornton (Ct.9)[5]

On August 13, 2016, at around 10:40 a.m., Jose N., who lived near 11th Avenue and West 63rd Street in the City of Los Angeles, was at home drinking with friends. He saw a black Chevy Malibu approach his house and double park in the street in front, next to his own car. Williams got out of the driver's side of the Malibu and asked Jose N. if he wanted to buy a cell phone. Bean remained seated in the passenger side of the parked Malibu, reclining.

Jose N. repaired cars for Kenyada Thornton. As he was speaking with Williams about the cell phone, Jose N. saw Thornton walking up 63rd Street towards them with two black objects in his hands. When Thornton approached, he asked Williams who was in her car, referring to Bean. She responded, "Don't worry about it. It's nobody." After observing this, Jose N. turned around to go inside his house to speak with his mother about buying the phone. But he saw Thornton tap on the Malibu's front window on the passenger side with one of the

---

[5]     Although Williams was acquitted of this murder, the facts are relevant for context and a full understanding of the relationship between Williams and Bean in connection with the other crimes of which she was convicted.

16

objects in his hands, likely the gun ("probably a nine" millimeter ), and then Thornton pointed the object in his hand downward toward the ground. Thornton said to the man in the car, "What are you doing around here?" and "You better get out of here, motherfucker." While inside his house but through a front window, Jose N. could see Thornton then put both his hands in front of his body while holding the objects in them, palms down. Thornton turned around to walk away with his back to the car before any shots were fired.

Jose N. then heard lots of gunshots, one kind distinctly louder than the other with the louder ones coming first. According to ballistics evidence, .45 caliber bullets are louder when shot than nine-millimeter bullets shot from a less powerful gun. Williams, who was still outside Jose N.'s house but interacting with him from inside about the phone, said to him, "I've gotta go." She got back into the black Malibu and drove away with Bean in the car.

Jose N. remained inside his house for about five minutes and someone called paramedics to assist Thornton, who had been hit and had collapsed. When Jose N. went outside, he saw Thornton lying on the sidewalk. There was a phone and a gun near Thornton's hand but someone in the gathered crowd removed those items before law enforcement arrived on scene. Law enforcement did not locate a firearm near Thornton's body later when securing the scene. Jose N. later noticed that his car parked in front of his house had been hit with bullets.

Thornton was not breathing when paramedics responded to the scene and transported him to a local hospital. An autopsy revealed Thornton had sustained a fatal gunshot wound to the chest and the manner of death was homicide.

Crime scene investigators arrived about a half hour after the shooting. They found eight .45 caliber casings and five or six fired .45 caliber bullets and bullet fragments. They also found multiple nine-millimeter bullet casings. The two different kinds of casings were generally located in two distinct areas. Car windows nearby had been shattered from bullet impacts. Two bullets were recovered from Jose N.'s car and a bullet casing was found in some grass nearby. The .45 caliber casings recovered from the Thornton crime scene were later found to match those from the Wilkerson and Pryor murders.

According to Williams, she drove Bean in his car to Jose N.'s house. She knew Jose N. as "Victor." While she and Victor spoke about the phone, Thornton, who was her friend and a Rollin' 60's gang member, approached her and asked, "What's up, Gigi?" He then asked her who was sitting in the Malibu, referring to Bean, and she responded not to worry, "It's nobody." She was attempting to diffuse any tension or conflict from her having brought an Eight-Trey gang member into Rollin' 60's territory. But at some point, Williams saw Thornton at the car asking Bean something like "Where are you from" and "Why are you here." She did not hear Bean's response but she walked over to Thornton and said, "Can you just leave us alone?" and "He's not over here for that." Williams turned back to trying to sell Victor the phone and then heard gunshots. She ducked behind a tree and saw Thornton shooting at the Malibu. She got into the car and she and Bean drove away.

According to Bean's testimony, Thornton, whose body was later found to have a Rollin' 60's tattoo, approached Bean's car while it was double parked in front of Jose N.'s house. Bean had accompanied Williams to the location inside Rollin' 60's gang

18

territory where she was trying to sell a phone. Bean knew that Rollin' 60's had a hit out on him for being an Eight-Trey member and dating Williams. He was reclining in the passenger seat of his parked car, trying to lay low. Thornton threw a gang sign, meaning he made a hand gesture to indicate his Rollin' 60's gang's claim of the neighborhood as its territory. Thornton then approached Williams and asked who was in the car. She told Thornton not to worry who was in the car and that they were just trying to "take care of [her] business." Then Thornton walked toward the car with his gun out, banged on the car with it, and said, "What you doing over here? You know where you at." After starting to walk away, Thornton turned around and began shooting at Bean through the car window while Bean was trying to get out or duck. Bean fired back at Thornton in self-defense. Thornton then ran away without Bean knowing whether he had shot him.

6.    The August 15, 2016 Arrest of Williams and Bean and Retrieval of the Gun

On August 11, 2016, law enforcement obtained identification information on the black Chevy Malibu found to be related to the crimes. The license plate could be seen on surveillance videos, from which it was determined that Bean was the registered owner. On August 15, 2016, Detective Garza alerted patrol officers to be on the lookout for the Malibu. That day, Detective Garza saw and followed the Malibu, in which Bean and Williams were riding, traveling on 80th Street. At around noon, Sergeant Ramirez, while on patrol, saw the car stop near a cannabis dispensary on Florence Avenue.

The dispensary was located next to a tobacco shop. Sergeant Ramirez parked his car up the street—a vantage point

19

from where he could watch the vehicle after calling for backup. While watching, the sergeant saw Bean get out from the driver's side of the Malibu and Williams get out from the passenger side and they both entered the tobacco shop. They seemed to be aware of the sergeant's presence. While Bean stood in front of the dispensary, Williams went back to the Malibu and retrieved a large purse from the passenger side, and then she went inside the dispensary. Sergeant Ramirez lost sight of Williams and Bean for up to half a minute but then he saw them leave the dispensary together and walk towards his location. They then began to walk in different directions. Sergeant Ramirez drew his weapon and stopped Bean, waiting for assistance while Bean lay on the ground. After Bean was handcuffed, Ramirez saw Williams standing across the street. She too was arrested and taken into custody without incident. DNA samples were taken from both Bean and Williams.

Detective Bellows arrived after Williams and Bean had been taken into custody. Sergeant Ramirez informed him that Bean and Williams had entered the dispensary before walking up the street. Bellows went inside the dispensary and obtained consent to search the premises from the owner. He found on the underside of a couch a semiautomatic firearm with a .45 caliber bullet in the chamber and more bullets in the magazine. The gun, bullets, and magazine were swabbed for DNA and booked into evidence.

Detective Garza located Bean's car, still running, outside the dispensary. It was impounded and taken to a tow yard. Bean's driver's license was found in a wallet recovered from inside the car. The license had the same address as the vehicle registration. A cell phone and some other items, including a

citation from August 9, 2016, during the crime spree, were also found inside the car.

Surveillance video from the dispensary and tobacco shop from August 15, 2016, at 11:31 a.m., showed Bean parking his car outside the dispensary in the same place where it was later seized by police. The footage also depicted Williams and Bean getting out of the car in the same clothing each was wearing when arrested. It further showed Williams retrieving the large purse from the car and then going into the dispensary, and Bean standing outside with his back turned to the camera. Williams was also shown on video from inside the dispensary secreting something in the couch where the gun was found.

7.    <u>Bean's Post-Arrest Statements to Police</u>

The day after his arrest, Bean was interviewed by police detectives. He was advised of his rights and impliedly waived them by answering questions. He admitted membership in the Eight-Trey gang but said he didn't "bang" anymore because of his age of 36. He said there was "no denying" that the Eight-Trey and Rollin' 60's gangs were enemies and that he was in Rollin' 60's territory during the Thornton shooting. He denied that he and Williams were in a sexual relationship. He denied having shot at Thornton first and claimed he was at a smoke shop around the corner from the crime scene when Wilkerson was killed and only ran into Williams unexpectedly after that.

8.    <u>Bean's Jail Calls</u>

Bean made a few recorded jail phone calls between the day of his arrest on August 15, 2016, and August 18, 2016. Law enforcement obtained the recordings, portions of which were played for the jury, with transcripts provided (with some sanitization by redactions). On August 15, 2016, the day of his

arrest, Bean called his friend Jeffrey Burton, known as "Doughboy," and in coded language suggested that Burton check "up under your couch" at the "smoke shop" on Florence Avenue for his items, referring to the gun Williams had left beneath the couch at the dispensary.

Bean made a second call on August 15, 2016, to a woman named Antoinette. In that call, he explained that the Rollin' 60's gang had put "a hit out on" him and were coming after him, "hunting for [him] every day," so he had "brought it to them" in their own territory, seemingly referring to his presence in Rollin' 60's territory when Thornton was killed. In his trial testimony, Bean denied that he had intentionally gone to Rollin' 60's territory to kill someone and said he was only defending himself.

Bean made a second call to Doughboy on August 16, 2016. In that call, again in coded language, Bean followed up on whether Doughboy had retrieved his "laundry" from under the couch by "lift[ing] the whole thing up." Doughboy responded that Bean's "laundry [was] not there" and that when Doughboy had inquired, the "manager" had said "the worst." This led Bean to ask, if the "worst" had occurred, implying that if the gun Williams had hidden under the couch at the dispensary had been found by law enforcement, why was he not then being charged with more than what he understood to be a probation violation. Bean later admitted in trial testimony that in the call, he was asking Doughboy to find and get rid of the gun hidden in the dispensary couch. He knew the gun had been used to shoot people, so he did not want it to be found. He and Williams did not discuss hiding the gun and he said he didn't know she had put it in or underneath the couch until after they left the dispensary.

On August 18, 2016, Bean called his mother. In that call, he relayed that the gun connected to "all that shit"—the murderous crime spree—had been found by law enforcement but he denied it was his gun. He blamed everything on "that bitch" or "that girl" and tried to distance himself. At trial, Bean testified that he was not referring to Williams in the call to his mother and that if he had ever said that Williams had used or owned the gun, he was lying and that he never let anyone use his gun.

9.    Ballistics Evidence Summary

The bullet casing found at the Wilkerson crime scene, the three casings and two bullets recovered at the Pryor crime scene, the bullet casing found on the passenger seat of Doxy's car, and the .45 caliber bullet casings from the Thornton crime scene and the bullet recovered from Thornton's body were all fired from the same gun retrieved from the cannabis dispensary near where Bean and Williams were arrested. The bullet recovered from Pryor's body and the bullet fragment recovered from Doxy's body were both of .45 caliber but neither could be positively matched to or excluded from that same gun. The bullet fragment recovered from Wilkerson's body was too small and damaged to be compared to the gun.

10.    Gang Expert Evidence

Although there were no gang charges or allegations, the prosecution presented opinion evidence from a gang expert. He testified that the Rollin' 60's and Eight-Trey gangs have been mortal rivals involved in an ongoing feud for many years. The rivalry had produced murders, shootings, vandalism, and graffiti. It was still ongoing in the summer of 2016.

23

The expert identified Bean from his tattoos as an Eight-Trey gang member with the moniker of "Tiny Diamond." A gang "associate," as Williams had been identified, is not a full-fledged member of a gang who has gone through some form of initiation, known as being "jumped in." A gang associate can be a friend or relative of a gang member, someone who grew up in the neighborhood, or just someone the gang members know.

The neighborhood where Thornton was killed is a "hot spot" for the Rollin' 60's gang. If an Eight-Trey gang member entered that territory in July or August of 2016, there would have been a "very high likelihood" of a response. Rollin' 60's gang members would have considered that action to be one of an enemy disrespecting the gang. In answer to a hypothetical question reflecting facts from Thornton's killing, the expert testified that if an Eight-Trey member ventured into a Rollin' 60's hot spot area armed with a gun, and the Eight-Trey member was approached by an armed Rollin' 60's gang member, depending on the Eight-Trey member's purpose in entering Rollin' 60's territory, the gun would be used either for self-protection or to shoot a rival.

The expert was not aware of any situation in which a male member of Eight-Trey and a male member of the Rollin' 60's were friends. But he could not rule out the possibility of a Rollin' 60's associate "hanging around" with an Eight-Trey member if they were dating across gang lines. Still, the consequences of a Rollin' 60's associate bringing a male Eight-Trey member into Rollin' 60's territory could be "physical violence on up."

B.   *Procedural Background*[6]

---

6      Additional procedural events as relevant to Williams's claims on appeal are discussed in connection with those claims.

An information alleging charges against Williams and Bean was filed on February 8, 2018.  At trial, on January 19, 2023, the People filed a second amended information.  The pleading alleged as against Williams four counts of first degree murder (Pen. Code, § 187, subd. (a)) (counts 1 (Wilkerson), 4 (Pryor), 8 (Doxy), and 9 (Thornton)); three counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) (counts 3, 7, & 11); and one count of assault with a firearm (§ 245, subd. (b)) (count 5, Sandra Pryor).  As to all four murder counts, multiple-murder special circumstances within the meaning of section 190.2, subdivision (a)(3) were alleged.  Special circumstances for murder committed during a robbery or burglary within the meaning of section 190.2, subdivision (a)(A) and (G) were alleged for the Pryor murder, and special circumstances for the murder of a witness within the meaning of section 190.2, subdivision (a)(10) for the Doxy murder.  Several aggravating factors were also alleged. (Cal. Rules of Court, rule 4.421).

As to the murder count 1 (Wilkerson), the second amended information alleged that Williams had personally used, intentionally discharged, and proximately caused death with a firearm (§ 12022.53, subds. (b)-(d)). Williams's prior strike and prior serious and violent felony conviction was also alleged as to all counts (§§ 667, subd. (a)(1); 667.5, subd. (b); 1170.12).

Ultimately, Williams was acquitted of Thornton's murder (count 9). And the court dismissed the assault count 5 as to Williams after the jury hung as to this count and the court declared a mistrial.  Williams was convicted of the remaining charges, except as to the Wilkerson murder (count 1), she was acquitted of first degree murder and the conviction was for the lesser murder in the second degree.  The special circumstances

and enhancement allegations were found true, and the People at trial abandoned proof of the aggravating factors after Williams waived a jury trial as to these. As noted, Williams admitted the prior strike and serious and violent felony conviction.

Williams ultimately received a sentence of two consecutive life terms without the possibility of parole for the two first degree murders (counts 4 (Pryor) and 8 (Doxy)), plus an aggregate term of 55 years to life, consecutive, for second degree murder (count 1 (Wilkerson)), 15 years, doubled, plus 25 years to life for the § 12022.53, subd. (d) enhancement), plus an aggregate determinate term of six years and eight months, consecutive, for the three gun-possession charges (counts 3 (two-year midterm, doubled), 7, and 11 (eight months (one-third midterm) doubled, for each). The court declined to exercise its discretion to dismiss the prior strike or to impose a lesser gun enhancement. As to two of the murder counts (1 & 4), the court imposed but stayed punishment for the five-year prior enhancements under section 667, subdivision (a)(1). The court granted 2,396 days of actual credits and imposed a restitution fund fine and two fee assessments, along with victim restitution, imposed jointly and severally as against Williams and Bean.[7]

## III.  DISCUSSION

A.  *No Abuse of Discretion in the Denial of Severance*

---

[7]  Bean was convicted of first degree felony murder in count 4 (Pryor); first degree murder in count 8 by aiding and abetting (Doxy); second degree murder in count 9 (Thornton); and assault with a deadly weapon in count 5 (Sandra Pryor), with true findings of firearm enhancements and special circumstances, as alleged. He was also convicted of gun-possession charges in counts 2, 6, and 10, and he admitted two prior strikes. He was acquitted of murder in count 1 (Wilkerson).

Williams moved pretrial for severance of parties by filing two separate written motions. On appeal, she challenges the trial court's denial of those motions. The factual bases of her challenge rest on: (1) Bean's jail-call recordings that allegedly implicated her; (2) Bean's trial testimony, allegedly negating her version of facts; and (3) the joint trial having allowed the prosecutor to prejudicially associate Williams and Bean as a "crime couple" who acted jointly with a single intent.

Williams's first motion, filed on February 23, 2021, sought separate trials for her and Bean on the ground that a joint trial would deprive Williams of her right to confront witnesses and to due process under the Sixth and Fourteenth Amendments, respectively, and would also violate the principles of section 1098, as enunciated in *People v. Aranda* (1965) 63 Cal.2d 518[8], and *Bruton v. United States* (1968) 391 U.S. 123. Also cited in the stated grounds were *People v. Fletcher* (1966) 13 Cal.4th 451 and *Gray v. Maryland* (1998) 523 U.S. 185 (co-defendant's extra-judicial statements inculpating defendant barred as hearsay and by the Sixth Amendment). The motion factually focused on Bean's post-arrest statements to law enforcement that placed Williams at or near the scenes of the Wilkerson and Thornton murders (the latter of which she was acquitted). It attached transcripts of these statements and contended they could not be effectively sanitized to avoid prejudice at trial.

Williams's second severance motion was filed on August 18, 2021, and its caption referenced "antagonistic defenses." The motion's stated grounds were that her defense was precluded by Bean's. The factual issues cited in support of this motion were

---

[8]     Superseded by statute on another ground as stated in *People v. Lamb* (2024) 16 Cal.5th 400, 431.

that with respect to Wilkerson's murder for which both defendants were charged, "it [wa]s possible" Bean would argue at trial that Williams was the killer and, also, the converse, that Williams "may" argue at trial that Bean was Wilkerson's "shooter." These potentialities did not come to pass at trial as neither defendant accused the other of Wilkerson's murder. Bean testified that he ran into Williams near the time and place of the murder, but she herself testified to these facts, asserting she was then in the area looking for Wilkerson to make sure he addressed his bail paperwork in connection with a court appearance that day. Cell phone data also showed her presence there and then.

The People filed a single opposition to both severance motions, on June 8, 2022, which attached several exhibits.[9] These attachments consisted of some of Bean's jail-call recordings and related transcripts and surveillance video footage depicting Williams taking her purse from Bean's car and then appearing to hide the gun in the couch at the dispensary just before she and Bean were arrested. The People argued that the alleged offenses and the parties were properly joined and that factors used to assess prejudice did not defeat the propriety of joinder here and would not cause undue prejudice at trial.

The trial court heard argument and denied Willliams's severance motions on June 15, 2022, pretrial. As to the denial of the first motion, the court cited that Bean did not accuse or even mention Williams in his recorded jail calls that were then before

---

[9]     The People's opposition below references Bean's separate motion to sever. It describes Bean's motion as asserting prejudice if all four murders were tried together and that his defense was inconsistent with that of Williams.

the court[10] and to the extent he might have alluded to her as having attempted to hide the gun, there was independent video evidence of her conduct in that regard. The court further referenced the existence of independent evidence that Williams, as she maintained, had gone to the location of Thornton's killing to sell a phone, not to "br[ing] it to" the Rollin' 60's, who were "after" Bean, as he had suggested in a jail call as his own possible motive for being there. The court again pointed to the existence of independent evidence of Williams's different reason for being there and suggested it could give the jury a limiting instruction as to Bean's statements, if necessary.

As to the denial of Williams's second motion to sever for antagonistic defenses, the trial court concluded that Williams had not met the burden of showing either a "conflict [] so prejudicial that the defenses are irreconcilable" or "that the jury [would] unjustifiabl[y] infer" from the conflict alone that both defendants are guilty. The court again cited "independent evidence … to support the defendants' guilt" such that the burden of overcoming the preference for a joint trial had not been met.

The Legislature has expressed a strong preference for joint trials and the "law of joinder and severance is settled." (*People v. Holmes, McLain and Newborn* (2022) 12 Cal.5th 719, 748 (*Holmes, McLain and Newborn*).) Section 1098 provides in relevant part: "When two or more defendants are jointly charged

---

10      It does not appear that Bean's jail call to his mother in which he discussed an unnamed woman as being responsible for the crimes was before the trial court when it denied severance. That call was played for the jury at trial. Although the prosecutor suggested that Bean was referring to Williams in that call, Bean denied this in his testimony.

with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials."

" 'Joint trials are favored because they "promote [economy and] efficiency" and " 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " ' (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.) 'When defendants are charged with having committed "common crimes involving common events and victims," as here, the court is presented with a " 'classic case' " for a joint trial.' (*Ibid.*)" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819.) "Separate trials may be appropriate 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' (*People v. Massie* (1967) 66 Cal.2d 899, 917.)" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 966 (*Thomas*); see also *People v. Hardy* (1992) 2 Cal.4th 86, 167 [same].)

But mutually antagonistic defenses are not per se prejudicial. (*Thomas, supra*, 64 Cal.App.5th at p. 966, citing *People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 819.) "On the contrary, severance is required for antagonistic defenses only when " ' " 'the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " ' ([*People v.*] *Coffman and Marlow, supra*, 34 Cal.4th at p. 41.)" (*Thomas, supra*, 64 Cal.App.5th at pp. 966–967.) " 'If the moving party's guilt can be established by sufficient independent evidence, "it is not the conflict alone that demonstrates … guilt," and severance is not required.' [Citation.]" (*Id.* at p. 967.)

30

"We review a denial of severance for abuse of discretion, considering the facts as they appeared at the time of the ruling. [Citation.] If the ruling was proper *when made*, a reviewing court may reverse only upon a showing that joinder ' " ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " ' [Citation.]" (*Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 748, italics added; accord *Thomas, supra*, 64 Cal.App.5th at p. 967.)

Williams concedes that the statutory requirements for joinder were met here. Undermining her claim of error, she does not focus her argument first on whether the trial court's ruling was correct *when made*, failing to isolate that critical temporal point and the matters then before the trial court that led to its ruling. Instead, she blurs those circumstances with the later events of the trial.

As noted, when Williams's severance motions were made, they were grounded in Bean's post-arrest statements to law enforcement that placed Williams at or near the scene and time of the Wilkerson and Thornton killings, and the possibility that Williams and Bean might each accuse the other of Wilkerson's murder. The People's opposition additionally put before the trial court post-arrest jail calls in which Bean had spoken in code to a friend, asking the friend to retrieve the murder gun left hidden in the couch at the dispensary just before Bean and Williams were arrested. It also included Bean's statements in another call that he was being targeted by the Rollin' 60's gang and had "brought it to them," referencing his intent or actions or reason for being in Rollin' 60's territory when Thornton was killed.

As further noted, when the trial court denied Williams's motions, it cited that Bean had not accused or even mentioned

31

Williams in the jail-call recordings then before the court and that there was in any event strong independent evidence—surveillance video—of Williams getting the gun out of Bean's car and secreting it inside the dispensary. The court also cited the existence of independent proof of Williams's own purpose in going to the location of Thorton's murder—to sell a phone—that was unrelated to Bean's statements about being targeted by a rival gang and "br[inging] it to them" as his reason or motive for being there, and that the court could give a limiting instruction on this to the jury, if necessary. The court further gave its reasoning that Williams's motions had not shown the existence of a conflict so prejudicial that the respective defenses were unreconcilable or that the jury would unjustifiably infer from the conflict alone that both defendants are guilty.

Williams has not shown that the trial court's ruling, when made, was an abuse of discretion. She appears to largely concede this. Her appellate argument does not point to a claimed abuse of discretion "considering the facts as they appeared at the time of the ruling," citing or analyzing the limited universe of evidence that was then before the court or the court's stated reasoning for denial of the motions. (*Holmes, McLain and Newborn, supra*, 12 Cal.5th at p. 748; *Thomas, supra*, 64 Cal.App.5th at p. 967.) She does not, for example, address the trial court's observation that Bean had not accused or even mentioned Williams specifically in the jail calls that were considered by the court. Nor does she address the court's having pointed to the existence of independent proof of Williams's efforts to hide the gun or of her reasons for being present at the location of Thornton's murder that were separate and apart from the inculpatory reasons that could be attributed to Bean from his jail call. Nor does Williams

32

address that her severance motions had asserted only a speculative and potential conflict in defenses that could possibly come about only if the defendants each chose to accuse the other of Wilkerson's murder and were not subject to cross-examination—possibilities that never ripened.

In sum, Williams does not identify just how or why, based on the facts before the court when it ruled, the court's denial of severance constituted a prejudicial abuse of discretion. Nor does she tie her claim of resulting prejudice to the facts asserted in the unsuccessful pretrial motions, or even to the totality of evidence that came later at trial or the verdicts. Neither abuse of discretion nor prejudice has been shown.

As to Bean's jail call to his friend using coded language about the gun hidden in the couch, Williams claims that at trial, this call allowed Bean to incriminate her by confirming she had hidden the gun. But Bean never said in the call who did the hiding and the surveillance video shown to the jury was itself strong independent evidence that Williams took the gun in her purse from Bean's car and hid it in the couch inside the dispensary. Also, percipient law enforcement testimony at trial supported at least some of what was seen on the video. It was not just Bean's recorded jail calls that allowed the prosecution to argue that Williams had hidden the gun—far from it.

As to the jail call in which Bean suggested his reasons for "br[inging] it to" the Rollin' 60's with respect to Thornton's murder, Williams indeed offered her own testimony at trial that she was in that location just to sell a phone. She was acquitted of this charge in any event.

As to Bean's jail call to his mother in which he blamed an unnamed woman for the crimes, he did not specifically mention

33

or identify Williams, he denied in testimony that he was referring to Williams in the call, and the call was not even part of what was before the court when it denied severance.  While the court later cited this call for giving the jury instruction on accomplice liability,  this was certainly not the only evidence supporting the proper giving of this instruction.

As to Bean's trial testimony, he did not blame or accuse Williams of any of the crimes.  Nor did she accuse him.  He placed her near the time and place of Wilkerson's murder, but her own testimony and the cell phone data evidence did the same.  There was also independent proof apart from Bean's testimony—that of L.S.—that Williams was an associate of the Rollin' 60's gang.  As to Bean's testimony that he and Williams drove directly to his friend Burton's house after the Pryor murder and he took a shower, denying having anything to do with the Doxy murder, Bean did not say he showered with Williams—her alibi—but he also did not deny having done so.  And he did not accuse Williams of either this murder or any of the others.

In short, nothing about Bean's statements to law enforcement, jail calls, or trial testimony "negat[ed]" Williams's version of the facts, as she now contends, even if there were minor factual discrepancies presented in their respective testimony.  Nor were the defendants' respective defenses in fact inconsistent, irreconcilable, or antagonistic, either at all or to the point that the prosecution's burden was lessened.  And both Bean and Williams having testified, they were available for cross-examination.  The record thus presents no basis from which to conclude that the jury was unable to make a reliable judgment from the evidence.  In fact, the jury was discerning in its acquittal of Williams of the Thornton murder and its acquittal of

Bean of the Wilkerson murder, as well as its having landed on the lesser included second degree murder verdicts against Williams for Wilkerson's murder and Bean for Thornton's.

As to the asserted prejudicial association between the defendants made at trial by the prosecutor's reference to them as a "crime couple," the prosecutor was free to argue and comment on the facts of the case. "A prosecutor is given wide latitude in arguing a case to the jury as long as it amounts to fair comment on the evidence." (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 61–62, citing *People v. Hill* (1998) 17 Cal.4th 800, 819 & *People v. Carter* (2005) 36 Cal.4th 1215, 1266 [not improper for prosecutor to comment on the state of the evidence]; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 153 [prosecution's argument of joint action was not appeal to find guilt by association but proper argument based on reasonable inferences jury could draw from the evidence].)

Further, the association did not join unequal characters of unequal culpability or taint one defendant against whom there was weaker evidence with stronger evidence against the other. Williams and Bean were equally accused and stood equally culpable of the same murders. Our review of the record leads us to conclude that the evidence presented against each defendant at trial was, in general, of similar weight. "We cannot say that the quantity and quality of the evidence implicating one defendant compared to the other was so dissimilar that the jury likely convicted" Williams on the strength of the evidence against Bean. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 151.) The evidence showed them romantically involved and together regularly during the two-week spree—acting together, protecting each other, and sharing the same car and gun. And the jury was

instructed that it had to consider each defendant's guilt separately.  Their verdicts were true to that directive, with varying acquittals and findings of guilt of lesser included offenses.  Williams's claim that the casting of her and Bean as a "crime couple" allowed verdicts with a unitary intent and caused extreme prejudice depriving her of fair trial is simply not borne out by the result of the trial or the whole record.

" 'In short, the joint trial was not unfair to [Williams] at all, much less grossly unfair. The [trial] court acted within its discretion in implementing the legislative preference for conducting joint trials.' [Citation.]" (*People v. Anderson* (2018) 5 Cal.5th 372, 388.)  Williams has not shown an abuse of discretion, much less a prejudicial one, or undue prejudice or gross unfairness resulting in a due process violation in the trial court's denial of her severance motions.

B.    *Sixth Amendment Claim Re Autopsy Testimony*

Williams contends the trial court violated her Sixth Amendment right of confrontation by admitting the trial testimony of a medical examiner that was based on autopsy reports of other nontestifying examiners who had conducted the autopsies of Wilkerson and Doxy.  The testifying medical examiner reviewed the reports and made factual observations about the bodies' conditions, and he formed and offered his own conclusions on the manner and cause of death, mostly from photographs and diagrams.  Williams argues her convictions for these two murders (counts 1 and 8) must be reversed as this amounted to a violation of her federal right of confrontation.

The People called Odey Ukpo, M.D., a medical examiner, as a witness at trial.  As he testified, a medical examiner is a physician who specializes in determining the manner and cause

of death and who performs autopsies to make these determinations. A medical examiner will perform an autopsy and then document their findings in a report. Notes are made at the examination, which include a diagram or chart of the body, and photographs are taken. The written report is generated from these. There are standard forms used in autopsy reports but each medical examiner produces their own reports in their own manner, whether generating the report themselves or using a transcriber. Photographs taken during an autopsy "are a permanent record of the case" and allow review of the autopsy results and an independent conclusion. The autopsy photos are taken by a forensic technician who can assist the medical examiner during the autopsy and can take photos beforehand, as is often done in homicide cases.

After explaining this general autopsy information, Dr. Ukpo gave testimony about the general practices of the Los Angeles County Medical Examiner, including its procedures for maintaining chain of custody and business records to enable later testimony, including by a medical examiner who did not perform the autopsy in a given case.

He then offered testimony and conclusions from the autopsy of Pryor, which he had performed, including his opinions on the manner and cause of death. He moved on to testimony about the autopsies of Wilkerson and Doxy, which he did not personally conduct, those procedures having been performed by other medical examiners. Dr. Chinwah, who had performed the Doxy autopsy in 2016, had by 2023 retired. Dr. Miller conducted the autopsy of Wilkerson in 2016. No reason was given for his unavailability at trial in 2023. The trial court made no unavailability findings. Dr. Ukpo concluded with his testimony

37

on the Thornton autopsy.  His entire testimony was relatively brief.

As to Doxy, Dr. Ukpo testified he had reviewed the autopsy report, associated documents, diagrams, photographs, and charts. Exhibits 61A and 61B, a photograph of Doxy's face showing a bullet wound and a coroner's chart, respectively, were identified and admitted in evidence without objection.  The autopsy report itself was not offered.  Dr. Ukpo answered questions about what the photograph depicted; he testified it showed the "entrance gunshot wound of [Doxy's] right cheek that has stippling present."  He concluded from the presence of stippling shown in the photograph that the gunshot had come from a range of one to three feet away.  Dr. Ukpo also testified about the diagram, which he said showed the entry wound and stippling in the face region but no exit wound.  From the diagram, Dr. Ukpo testified there was a known bullet trajectory from "front to back and downward" and the bullet projectile was "located in the neck, in the spine region."

Dr. Ukpo testified that after reviewing the Doxy autopsy documentation, the conclusions of which he did not relay, he formed his own opinion that she had died of a gunshot wound to the face with homicide as the manner of death.

As to Wilkerson, Dr. Ukpo was likewise provided with the autopsy report, charts, and photographs.  Five photographs and one coroner's chart or diagram were identified as Exhibits 62A-E, and admitted into evidence without objection, with the report itself again not offered.  One photograph, as explained by Dr. Ukpo,  depicted "the right thigh, where there's an entrance gunshot wound and there's a rod placed through that" to "show the direction of the bullet as it traveled through the body."  The

38

gunshot wound was shown on the photograph on "the front side of the thigh, near the groin region." As explained by Dr. Ukpo, another photograph showed the "entrance gunshot wound of the right thigh" with yet another showing "the exit gunshot wound of the right thigh."

Dr. Ukpo reviewed the coroner's chart or diagram accompanying the photographs to render his "own opinion as to the cause and manner of death." He showed the jury the locations of the bullet entrance and exit wounds on the diagram, testifying there was "a path of travel" of the bullet "from [Wilkerson's] front to back, his left to right, and downward." Dr. Ukpo said there were no "projectiles recovered" from Wilkerson's body but "fragments," not a "completely intact bullet," were recovered and "collected and preserved for evidence." He opined that the "gunshot wound cause[d] massive blood loss and [Wilkerson's] death." After reviewing "the autopsy report, photos, charts, [and] notes," Dr. Ukpo came to his "own conclusion" that the cause of death was "gunshot wound of [the] leg" and that the "manner of death" was "homicide." When asked, Dr. Ukpo was not able to determine from the autopsy documentation exactly how close the gunshot wound was to Wilkerson's genitalia but he could see from the photo and diagram that it was "fairly close" and there was no stippling found.

In sum, as to the Doxy and Wilkerson murders, Dr. Ukpo relayed to the jury brief, objective, and factual information about the conditions of the bodies from the two autopsy reports prepared by other medical examiners. He formed his own conclusions and opinions on the cause and manner of death as derived from his review of the reports and his observations from

the autopsy photographs and diagrams. Williams did not object to the admission of his testimony or to the autopsy photos and diagrams either on hearsay or Sixth Amendment grounds. Her appellate challenge appears to be limited to a claimed violation of her federal right of confrontation based on Dr. Ukpo's oral testimony alone.

We conclude the challenge is forfeited. Williams acknowledges she did not object to Dr. Ukpo's testimony. But, citing inapt authority, she contends a failure to object at trial does not preclude her from raising a constitutional violation. (See, e.g., *Caldwell v. Mississippi* (1985) 472 U.S. 320, 326–328 [existence of state procedural bar such as waiver does not deprive federal court of jurisdiction].) She also cites California authority recognizing a reviewing court's discretion to reach a forfeited claim and urges that the "stark violation of [her] fundamental right of confrontation under the Sixth Amendment" warrants the exercise of our discretion to overlook the forfeiture and reach the merits.

As argued by respondent, an appellant is ordinarily precluded from challenging the admissibility of evidence on appeal if no objection was raised in the trial court. (Evid. Code, § 353; *People v. Dykes* (2009) 46 Cal.4th 731, 756.) As to challenges based on the federal right of confrontation, the California Supreme Court has repeatedly applied the forfeiture rule. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 710; *People v. Riccardi* (2012) 54 Cal.4th 758, 827, fn. 33, overruled in part as stated in *People v. Gomez* (2018) 6 Cal.5th 243, 297; *People v. Dement* (2011) 53 Cal.4th 1, 23, overruled in part as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Redd* (2010) 48

Cal.4th 691, 730; *People v. D'Arcy* (2010) 48 Cal.4th 257, 289–290.)

In *People v. Nadey* (2024) 16 Cal.5th 102, 162 (*Nadey*), a recent case, the high court concluded the claim was not forfeited, because the trial had occurred five years before *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*), the seminal case from which the currently operative legal principles evolved. We see no reason to deviate from the forfeiture rule here.

But Williams alternately claims ineffective assistance of counsel for her trial attorney's failure to object to Dr. Ukpo's testimony. We reject this claim, effectively reaching the merits of the alleged constitutional violation, and finding neither deficient performance by counsel nor any prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Any objection to Dr. Ukpo's testimony would have lacked merit or been pointless. His testimony was admissible as consisting either of generalized autopsy practices, factual observations about the condition of a victim's body, which is not testimonial hearsay, or his own opinions and conclusions on the manner and cause of death. These opinions and conclusions were based on his own, independent review of the autopsy reports and were largely derived from photographs and diagrams. Any arguably testimonial hearsay was minor, was independently established by other proof, and was not prejudicial.

To prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that there was prejudice resulting from the acts or omissions, meaning a reasonable probability the result would have been different without the deficient performance.

41

(*Strickland, supra*, 466 U.S. at p. 687–688; accord *Bell v. Cone* (2002) 535 U.S. 695; *Williams v. Taylor* (2000) 529 U.S. 362, 390; *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  This is a "highly demanding" standard requiring proof of "gross incompetence." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 382.)  When the claim is brought in the context of a direct appeal, the court examines the record to ascertain the existence of any explanation for the challenged aspects of the representation. (*Mai, supra*, 57 Cal.4th at p. 1009.)

Neither deficient performance nor prejudice is shown here based on the state of the law and the state of the record.

The admission of testimonial, hearsay statements by a nontestifying witness without a prior opportunity for cross-examination violates the defendant's right to confrontation under the Sixth Amendment. (*Crawford, supra,* 541 U.S. at p. 68.)  This right to confrontation "bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 580–581; accord, *Crawford, supra*, at p. 68; *Nadey, supra*, 16 Cal.5th at p. 162.)

The high court in *Crawford* did not provide a comprehensive definition of " "testimonial," " and such a definition " 'awaits articulation.' " (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398 (*Gonzalez*); *Nadey, supra*, 16 Cal.5th at p. 164.) But it is clear that a testimonial statement has two critical components.  "First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in

42

some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*).)

Both the United States Supreme Court and the California Supreme Court have addressed *Crawford*'s application to forensic reports. (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310–311 [affidavits reporting forensic analysis were testimonial as they were functionally identical to live testimony]; *Bullcoming v. New Mexico* (2011) 564 U.S. 647, 652, 665 [certified forensic laboratory report required to assist police investigations constituted testimonial statements]; *Williams v. Illinois* (2012) 567 U.S. 50, 56–58, 84–85 [expert testimony that DNA profile produced by outside lab matched profile produced by state police not testimonial hearsay; testimony was not admitted to establish truth of the report, only to explain basis of expert's independent conclusion and report's primary purpose was not related to criminal investigation]; *Dungo, supra*, 55 Cal.4th at pp. 619–621 [autopsy reports and related testimony]; *Nadey, supra*, 16 Cal.5th at pp. 161–165 [same].)

*Dungo,* in which the victim's autopsy report was likewise not admitted into evidence*,* defined the parameters for a substitute coroner's testimony.  Our Supreme Court held that statements in an autopsy report describing the condition of the murder victim's body were not testimonial under the Sixth Amendment. (*Dungo, supra*, 55 Cal.4th  at pp. 617–621.)  The court specifically considered whether a pathologist may testify about statements in an autopsy report prepared by another, nontestifying pathologist.  It concluded that factual and objective observations about the condition of the victim's body by a nontestifying pathologist and recorded in an autopsy report were not testimonial because they lacked formality and criminal

43

investigation was not the autopsy's primary purpose. (*Id*. at pp. 619–621.) The court distinguished statements merely describing anatomical and physiological observations from statements setting forth the pathologist's conclusions, the former less formal and therefore not testimonial. (*Id*. at pp. 619–620.) The testifying pathologist's "description to the jury of objective facts about the condition of [the victim's] body, facts he derived from the [nontestifying expert's] autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine [the nontestifying expert]." (*Id*. at p. 621.)

In *People v. Leon* (2015) 61 Cal.4th 569, our high court further explained: "It is clear that the admission of autopsy photographs, and competent testimony based on such photographs, does not violate the confrontation clause. . . . It is also clear that testimony relating the testifying expert's own, independently conceived opinion is not objectionable, even if that opinion is based on inadmissible hearsay. [Citations.] . . . The hearsay problem arises when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence." (*Id*. at p. 603, italics omitted; see also *People v. Gonzales* (2019) 34 Cal.App.5th 1081, 1090; *Nadey, supra*, 16 Cal.5th at pp. 162–163 [autopsy photographs and competent testimony on them are not hearsay; nor are an expert's independently formed opinions even if they were based on inadmissible hearsay].)

Attempting to avoid *Dungo*'s application here as to the lack of formality of autopsy reports, Williams argues the primary purpose of an autopsy *is* for use in criminal investigations. But this contention is directly contrary to *Dungo*'s authoritative holding—a report generated from an autopsy is not testimonial

hearsay.  We are bound by this precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Williams also claims that the California Supreme Court abandoned *Dungo*'s explication of the formality requirement in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  Not so. *Sanchez* reaffirmed this principle and even used the formality requirement in assessing whether statements in that case were testimonial. (See *Sanchez*, at pp. 689, 694, 694–697.)  Further, *Sanchez* confirmed that an expert "may rely on hearsay in forming an opinion, and may still tell the jury in general terms that he did so" without violating either hearsay rules or the confrontation clause. (*Id.* at p. 685, italics omitted; see also *People v. Perez* (2018) 4 Cal.5th 421, 456 (*Perez*); *Nadey, supra*, 16 Cal.5th at p. 163.)  *Sanchez* also held that general knowledge in an expert's field and background information within an area of expertise, as opposed to case-specific facts, is admissible, such as habit or custom offered to prove conduct on a specified occasion was in conformity with that. (*Sanchez, supra*, 63 Cal.4th at p. 683–686.)

In the 2018 cases of *Perez* and *People v. Garton* (2018) 4 Cal.5th 485 (*Garton*), the California Supreme Court held that the admission of pathologists' testimony about autopsy reports prepared by nontestifying pathologists did not constitute reversible error.  In *Perez*, the testifying pathologist's description of hemorrhaging in the victim's eyes, the depth of the knife wounds, and internal injuries "related case-specific facts about the victim's body that were taken directly from the [nontestifying pathologist's] autopsy report and no other sources," and therefore constituted hearsay under *Sanchez*. (*Perez, supra*, 4 Cal.5th at p. 456.)  Nevertheless, declining to address "*Dungo*'s continued

viability," *Perez* concluded that any federal constitutional error was harmless beyond a reasonable doubt. (*Ibid*.) It was undisputed that the victim had been choked and stabbed, and the pathologist's testimony about the details of the victim's injuries were such "minor pieces of evidence" in light of other evidence presented at trial that they had no effect on the jury's guilt determination. (*Id*. at p. 457.) Nor was it error for the testifying pathologist to rely on hearsay in forming his opinion about the cause of death. (*Ibid*.)

*Garton* held the testifying coroner's own opinions—based on an autopsy report a retired coroner had prepared—were not objectionable to the extent the testifying coroner did not directly or implicitly convey any statements the nontestifying coroner had made in the report. (*Garton, supra*, 4 Cal.5th at pp. 504, 506.) Without mentioning *Dungo*, *Garton* reasoned that certain statements made in the autopsy report and related by the testifying coroner "did communicate out-of-court statements to the jury because the autopsy report contained the out-of-court statements of [the nontestifying coroner]. . . . Because these facts were offered for their truth, they were hearsay." (*Id*. at p. 506.) But *Garton* concluded that, even if those statements were testimonial, any constitutional error was harmless beyond a reasonable doubt. Only a few of the testifying coroner's statements amounted to hearsay, and the state of the victim's body and the manner of her death were undisputed. (*Id*. at p. 507.)

In *Nadey*, again without comment on *Dungo*'s formality explication, the high court, on facts with almost no daylight between them and those presented here, determined that autopsy photos and testimony on them and the testifying examiner's own

46

opinions derived from a nontestifying examiner's autopsy report did not violate the confrontation clause. (*Nadey, supra*, 16 Cal.5th at pp. 161–165.) The court categorized the testimony as consisting of (1) statements relating to the nontestifying examiner's autopsy report and relaying that person's observations and opinions; (2) testimony describing or explaining photos from the autopsy; (3) testimony covering the testifying examiner's own opinions based on information conveyed in the autopsy report or his examination of accompanying photographs; and (4) testimony describing the custom and practice the nontestifying examiner would have followed in collecting and preserving evidence samples for forensic analysis. (*Id*. at p. 162.)

Only the first category of testimony was determined to raise a "potential confrontation clause issue." (*Nadey, supra,* 16 Cal.5th at p. 162.) Ultimately, even that did not. While the testifying examiner referred to the report in answering some questions, and in doing so, "he may have relayed some details from the report in giving his answers," any "confrontation error was harmless beyond a reasonable doubt. (*Chapman* [*v. California* (1967) 386 U.S. 18,] 24; [Citation].) The jury received ample evidence of [the victim's] wounds and sexual assault from nonhearsay sources, including the autopsy and crime scene photographs and police testimony. Moreover, the condition of [the victim's] body and the cause of [] death were undisputed. (See *Garton, supra*, 4 Cal.5th at p. 507; *Perez, supra*, 4 Cal.5th at p. 457.) The defense did not contest the manner of [the victim's] death. Instead, it challenged who had caused it." (*Nadey, supra,* 16 Cal.5th at p. 164.)

This case is no different. As framed by these operative legal principles, Dr. Ukpo's testimony on the autopsies of Doxy

47

and Wilkerson did not violate the Sixth Amendment, and therefore counsel's lack of objection did not amount to deficient performance.

Dr. Ukpo's testimony about the condition of the bodies of Doxy and Wilkerson consisted of objective and factual information and it was not testimonial. (*Dungo, supra*, 55 Cal.4th at pp. 619, 621 [factual observations about the conditions of a victim's body are not testimonial hearsay].) His conclusions and opinions were his own, drawn from photographic evidence and the autopsy reports, the conclusions of which he did not relate to the jury. He was permitted to rely on the autopsy reports of nontestifying examiners and related documentation in reaching his own conclusions and to state that he had. (*Sanchez, supra*, 63 Cal.4th at p. 685.) A fair reading of the record does not support that Dr. Ukpo was simply repeating conclusions from the nontestifying examiners' reports. (See *Nadey, supra*, 16 Cal.5th at pp. 163–164, fn. 23.) Further, photographs, and conclusions from them, are not hearsay, let alone testimonial hearsay. (*Leon, supra*, 61 Cal.4th at p. 603; *Garton, supra*, 4 Cal.5th at p. 603 [autopsy photos not hearsay because they are not out-of-court statements].)

Finally, here, as in *Nadey*, *Perez* and *Garton*, "the state of [the victims'] bod[ies] and the manner in which [they] died" were not in dispute. (*Garton, supra*, 4 Cal.5th at p. 507; *Perez, supra*, 4 Cal.5 th at p. 457 ["evidence bearing no connection to the hearsay statements, such as photographs and police testimony, showed that someone had choked [the victim] and stabbed her multiple times"].) There was no dispute here that Wilkerson and Doxy were killed by gunshot. And there was other proof of this—from percipient observations of law enforcement who investigated the

crime scenes to photographs to surveillance video showing the muzzle shot in Doxy's face. Other evidence, for example, showed that Wilkerson had been shot near or in the general area of his groin, which the prosecutor pointed out in arguing that the location of the shot showed a jealous lover. An investigating detective present when Wilkerson's body was collected testified to personally observing the gunshot wound "on the right upper thigh area next to his groin." And the autopsy photos showing the gunshot wound and its location on Wilkerson's body were admitted in evidence without objection.

As to the ballistics evidence connecting the same gun to all four murders, it was not bullets or fragments recovered from the bodies of Doxy and Wilkerson that made this connection. It was, rather, casings from these crime scenes—unrelated to the autopsies—that showed the link. Thus, even assuming a confrontation clause violation by some challenged aspect of Dr. Ukpo's testimony, however minor, on this record, there was no prejudice. (See *Chapman, supra*, 386 U.S. at p. 24; accord *Gonzalez, supra,* 12 Cal.5th at p. 398 [confrontation-clause error is harmless where it is clear beyond reasonable doubt a rational jury would have found defendant guilty absent the error].)

While we view Williams's claim of a Sixth Amendment violation as forfeited, we nonetheless have effectively reached the merits in disposing of her claim of ineffective assistance of counsel. Because there was no confrontation-clause violation, any objection to the testimony of Dr. Ukpo on the autopsies of Doxy and Wilkerson would have been pointless or lacking in merit. There was thus no deficient performance. Moreover, given what would have been an unmeritorious or pointless objection, counsel may well have tactically chosen to refrain from objecting.

49

Williams claimed she did not shoot Wilkerson or Doxy, and was not present when they were shot, so any tactical advantage to be gained by questioning the causes of their deaths was elusive and beside the point. As our high court has "repeatedly stressed," if " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) "[T]actical choices presented . . . on a silent record . . . are better evaluated by way of petition for writ of habeas corpus, and on direct appeal we reject them." (*People v. Mayfield* (1993) 5 Cal.4th 142, 188.)

And as in *Nadey*, even if some aspects of the testimony were testimonial, they were minor in nature and not prejudicial in effect. Thus, there was no reasonable probability the outcome would have been different absent the alleged failure to have objected to Dr. Upko's testimony. (*Strickland, supra*, 466 U.S. at p. 687; *People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

We accordingly find Williams's claim that her federal right of confrontation was violated to be forfeited. And we reject her related claim of ineffective assistance of counsel finding no deficient performance, but even assuming such a breach, no prejudice.

C. *No Instructional Error Re CALCRIM No. 540B*

    1.   <u>Williams's Claim as Affecting Her Felony Murder Conviction on Count 4</u>

As to Williams, not Pryor's actual shooter, the trial court instructed the jury with respect to first degree felony murder with a modified CALCRIM No. 540B and, relatedly, CALCRIM

No. 703.[11]  As given here, the modified CALCRIM No. 540B included an optional statement that a "person acts with reckless indifference to human life when she knowingly engages in criminal activity that she knows involves a grave risk of death." (Italics omitted.)  This exact language has been interpreted by our Supreme Court to mean that " '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' (*People v. Banks* (2015) 61 Cal.4th 788, 801 [(*Banks*)].)" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 203.)

As given, the modified CALCRIM No. 540B also included the optional non-exclusive enumerated factors for the jury to consider when assessing whether Williams, again not Pryor's actual shooter, was a "major participant" and acted with "reckless indifference to human life" in committing a targeted offense—attempted robbery or burglary—for felony murder purposes under *Banks, supra,* 61 Cal.4th at pp. 803–808 and *People v. Clark* (2016) 63 Cal.4th 522, 614–620 (*Clark*).

Williams did not object to the giving of CALCRIM No. 540B as modified.  Nor did she request that additional definitions of the phrase "reckless indifference to human life" be given. On appeal, she claims the giving of the modified CALCRIM No. 540B was instructional error because, she argues, it is incomplete as to the definition of reckless indifference to human life.  She

_____

[11]     As given, CALCRIM No. 703, the instruction for felony-murder special-circumstances under section 190.2, subdivision (d), referenced CALCRIM No. 540B for the "factors to consider if defendant was a major participant who acted with reckless indifference to [human life]."

contends this allowed the jury to find her guilty of first degree felony murder without finding that she "consciously accepted death as a permissible consequence of achieving the goals of her criminal activity" in addition to finding that she subjectively knew her actions during the criminal activity—attempted robbery or burglary—created a grave risk of death.

This claim derives from *Clark*'s explication of reckless indifference to human life as having two components—both subjective and objective elements. "The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 617.)

As summed up by Williams, this twofold definition requires evidence—and an instruction—that the defendant both "(1) was aware of and willingly involved in the violent manner in which the target felony was committed …, and (2) personally harbored a willingness to kill to achieve the goal of the target offense, even if the defendant does not specifically desire that a death results from the defendant's actions." She contends "the second part of this definition is missing from CALCRIM No. 540B," rendering it a misstatement of the law. Her focus is on a requirement— allegedly missing from the given instruction—that a defendant consciously accept death as a permissible consequence of achieving the goals of the criminal activity, beyond that which is inherent in the statutorily enumerated targeted offenses of felony murder. (See § 189, subd. (e)(3).)

52

As applied to the facts here, and without regard to the full trial record, Williams contends the claimed instructional error allowed the jury to erroneously find she acted with reckless indifference to human life merely by entering Pryor's motel room with the intent to use counterfeit money to obtain cocaine, while being aware that Bean was likely armed with a loaded gun. She claims more was specifically required from the evidence and from the instruction—that she also consciously accepted death as a permissible consequence of achieving the goals of her criminal activity.

As we explain, no more was legally required from the modified CALCRIM No. 540B, as given.

2.      Standard of Review and Forfeiture of the Issue

"In a criminal case, a trial court has a duty to instruct the jury on ' " ' "the general principles of law relevant to the issues raised by the evidence." ' " ' [Citation.] The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.] As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*); accord *People v. Thomas* (2023) 14 Cal.5th 327, 385.)

The " 'language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*Estrada*, *supra*, 11

53

Cal.4th at p. 574; accord *People v. Ramirez* (2021) 10 Cal.5th 983, 1001.)

As relevant here, section 189, subdivision (a) provides that murder "committed in the perpetration of, or attempt to perpetrate, … robbery [or] burglary … is murder in the first degree." Under section 189, subdivision (e), a "participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and *acted with reckless indifference to human life*, as described in subdivision (d) of Section 190.2 [felony-murder special circumstance]." (Italics added; see *People v. Arellano* (2024) 16 Cal.5th 457, 467–468.) Section 190.2, subdivision (d) states that if the felony-murder special circumstance is found true, the prescribed penalty applies to "every person, not the actual killer, who, *with reckless indifference to human life* and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in … subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor." (Italics added; see *People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).)

"We review a claim of instructional error de novo." (*People v. Thomas, supra*, 14 Cal.5th at p. 382; see *People v. Myles* (2023) 89 Cal.App.5th 711, 728 (*Myles*).) We evaluate " ' " 'the entire charge of the court, not from a consideration of parts of an

instruction or from a particular instruction.' [Citations.]" ' [Citation.] ' "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." ' " (*People v. Thomas, supra*, at p. 382; see *Myles*, at p. 729.) We consider the entire trial record and the arguments of trial counsel in assessing the probable impact of the instructions on the jury. If that meaning was not objectionable, the instructions cannot be deemed erroneous. (*People v. Kumar* (2019) 39 Cal.App.5th 557, 564.) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Ibid.*)

Williams does not contend that the trial court's giving of the modified version of CALCRIM No. 540B here for felony murder as pertains to her for Pryor's murder included an affirmative but erroneous statement of the law. Rather, she claims that the omission of her added component to the definition of reckless indifference to human life that a defendant must consciously accept death as a permissible consequence of achieving the goals of the criminal activity rendered the instruction a misstatement of the law.

We conclude that the challenged instruction, as given, satisfied the trial court's sua sponte duty to instruct the jury on the general principles of the law of felony murder, as relevant to the issues raised by the evidence, including as to the phrase "reckless indifference to human life" as applicable to a defendant not the actual killer. The court, in fact, provided more than the language of the statute (§§ 189, subd. (e); 190.2, subd. (d)) or authoritative case law require. And it did so without objection or

55

a request from Williams to add the language she now claims was necessary, resulting in forfeiture of the appellate issue. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461 *People v. Lee* (2011) 51 Cal.4th 620, 638; see also *People v. Howard* (2024) 104 Cal.App.5th 625, 660 [failure to request clarification of an otherwise correct instruction forfeits the claim for purposes of appeal]; see *People v. Nelson* (2016) 1 Cal.5th 513, 542 [on request, criminal defendant entitled to pinpoint instructions that relate particular facts to an element of a charged offense and highlight or explain a defense theory if the proffered instruction is supported by substantial evidence].)

As we see it, Williams's claim of instructional error thus distills to an argument that the trial court did not include a pinpoint instruction she never requested. (See generally, e.g., *People v. Saille* (1991) 54 Cal.3d 1103, 1119.)  We nonetheless address the merits to show that the modified CALCRIM No. 540B, as given, satisfied the trial court's sua sponte instructional duties and was not erroneous or a misstatement of the law.

  3. <u>Applicable Law of Felony Murder</u>

As noted, to be guilty of felony murder, the trier of fact must find that the defendant was either (1) the actual killer; (2) a direct aider and abettor who acted with intent to kill; or (3) a major participant in the underlying enumerated felony who acted with reckless indifference to human life. (§ 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 959.)  The same requirements apply to a true finding of the felony-murder special circumstance under section 190.2, subdivision (d) (so the law interpreting and applying that statute before the changes to section 189, subdivision (e) on felony murder, effective January 1, 2019, are relevant and controlling). (*People v. Superior Court* (*Ferraro*)

56

(2020) 51 Cal.App.5th 896, 907.) When section 189, subdivision (e) was amended as part of Senate Bill 1437 (Reg. Sess. 2017-2018) (Stats. 2018, ch. 1015, § 4.) to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements as they were elucidated in *Banks* and *Clark*. (*Strong, supra,* 13 Cal.5th at p. 710.)

*Banks* and *Clark* delineated the meaning of "major participant" and "reckless indifference" and announced non-exclusive factors to be considered as part of these inquiries. *Banks* focused primarily on what it means to be a "major participant" while *Clark* addressed the "reckless indifference" requirement, although there is significant overlap among the non-exclusive factors considered for each. (*Strong, supra,* 13 Cal.5th at p. 706.) As developed in *Banks* and *Clark*, these factors derive from *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). (*Banks, supra,* 61 Cal.4th at p. 794.) *Banks* concluded that these cases were placed on a spectrum and permitted the imposition of the death penalty only when defendants' "involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Ibid.*)

*Banks* set forth non-exclusive factors to consider in evaluating whether the defendant was a major participant and exhibited reckless indifference to human life: (1) the defendant's role in planning the criminal enterprise that led to one or more deaths; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants; and (4) whether the defendant was present at the scene of the killing, in a

position to facilitate or prevent the actual murder, or played a particular role in the death. (*Banks, supra*, 61 Cal.4th at p. 803.) "No one of these considerations is necessary, nor is any of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid.*)

*Banks* concluded that section 190.2, subdivision (d)— special circumstances for felony murder—codified the language from the United States Supreme Court cases of *Tison* and *Enmund* that looks "to whether a defendant has" ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' " (*Banks, supra,* 61 Cal.4th at pp. 799, 801; see also *Estrada, supra,* 11 Cal.4th at p. 577 [reading *Tison* to have instructed that culpable mental state of " 'reckless indifference to life' " is one in which defendant " 'knowingly engag[es] in criminal activities known to carry grave risk of death' " and so ascribed that meaning to the statutory phrase in section 190.2, subdivision (d)].) *Banks* characterized the United States Supreme Court in *Tison* and *Enmund* as having held: "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Id.* at p. 801.)

After *Banks, Clark* observed that " 'reckless indifference,' " the mens rea requirement, has "subjective and objective elements." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617.) "The subjective element is the defendant's conscious disregard of risks known to him or her," while the objective element considers "what 'a law-abiding person would observe in the actor's

situation.' " (*Ibid*.) *Clark* identified the following factors as pertinent to whether a defendant acted with reckless indifference to human life, without assigning or isolating the factors to either the subjective or objective components: (1) the defendant's knowledge that weapons would be used and/or their personal use of weapons; (2) the defendant's physical presence at the scene and their opportunity to restrain the crime or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of their accomplice's propensity to kill; and (5) the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Id.* at pp. 618–623; see also *In re Scoggins* (2020) 9 Cal.5th 667, 680–681.) The court cautioned that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark, supra,* 63 Cal.4th at p. 618.)

The Supreme Court in *Clark* did not hold that a trial court had a sua sponte obligation to instruct on these factors. And no authority has since so held. (See *People v. Price* (2017) 8 Cal.App.5th 409, 444 (*Price*) [where jury is instructed in language of section 190.2, subdivision (d), trial court has no sua sponte duty to further amplify "reckless indifference to human life"]; see also *Strong, supra*, 13 Cal.5th at pp. 719–720 [the "mandatory instructions" on the felony-murder special circumstance did not change after *Banks* and *Clark*, but defense counsel may ask the court to instruct the jury on the relevant factors]; *People v. Farfan* (2021) 71 Cal.App.5th 942, 956 [jury's true finding on felony-murder special circumstance under CALCRIM No. 703, which did not include *Clark* factors, still established defendant was ineligible for resentencing relief under section 1172.6 by preclusive effect]; *People v. Allison* (2020) 55 Cal.App.5th 449, 458 [jury instructions on the mental state for felony murder are

not defective if they do not include the *Banks* and *Clark* factors], disapproved on another ground as stated in *Strong, supra*, 13 Cal.5th at p. 718, fn. 3.)

*Clark* noted there is " 'significant[] overlap' " between the "major participant" and "reckless indifference to human life" requirements because " 'the greater the defendant's participation in the felony murder, the more likely that [they] acted with reckless indifference to human life.' " (*Clark, supra,* 63 Cal.4th at pp. 614–615.) Further, " 'there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life.' " (*Id.* at p. 615.) But *Clark* also observed that a defendant who is merely involved in a first-degree felony murder does not automatically act with reckless indifference to human life. (*Id.* at p. 616.)

In *Estrada, supra,* 11 Cal.4th 568, the California Supreme Court held that the phrases "major participant" and "reckless indifference to human life" have ordinary meanings that are commonly understood without the need for further amplification. (*Id.* at p. 578; see also *Price, supra*, 8 Cal.App.5th at p. 444 [trial court's definition of " 'reckless indifference to human life' as 'knowingly engag[ing] in criminal activity that he or she knows involves a grave risk of death' " was "one that a jury may reasonably be expected to understand"].) Because of this, a trial court does *not* have a sua sponte duty to define for a jury "reckless indifference to human life," whether by inclusion of the enumerated factors or anything else. (*Ibid.,* italics added) The *Estrada* court also clarified that its holding should not be understood to discourage trial courts from amplifying the statutory language for the jury if requested. (*Id.* at p. 579.)

The *Banks* and *Clark* factors for considering whether a defendant was a major participant who acted with reckless indifference to human life were added to CALCRIM No. 540B in 2020, but they are bracketed and still considered optional, not mandatory. (Judicial Council of Cal., Crim Jury Instns. (2024).) As explained in *Strong*, the *Banks* and *Clark* factors changed "the trial environment" (*Strong, supra*, 13 Cal.5th at p. 719), and defense counsel are free to take advantage of this change. *Banks* and *Clark* "offered a range of guiding factors and made clear that simple participation in, e.g., a 'garden-variety armed robbery' was not sufficient, without more, to establish the truth of the felony-murder special circumstance. [Citation.] The newly articulated guiding factors might also have altered what evidence defense counsel would have sought to introduce. And more broadly, the clarifications *Banks* and *Clark* offered about the height of the bar needed to prove a felony-murder special-circumstance finding might have fundamentally altered trial strategies . . . . As for instructions, after *Banks* and *Clark*, defense counsel could have asked that optional additional instruction on the *Banks* and *Clark* factors be given to guide the jury in its deliberations . . . ." (*Id.* at pp. 719–720.)

These observations hold equally true for what is now required under section 189, subdivision (e) for felony murder for one not the actual killer or an aider and abettor with intent to kill. No authority holds that the *Banks* and *Clark* factors or any other additional language are legally required as part of CALCRIM No. 540B to define the phrase "reckless indifference to human life."

### 4. No Error and No Prejudice

As our discussion of the relevant authorities shows, there was no claimed instructional error here. The trial court was not required, on top of the optional *Banks* and *Clark* factors, and on top of the added optional definition of the phrase "reckless indifference to human life" given here as "knowingly engag[ing] in criminal activity that [defendant] knows involves a grave risk of death" —language almost identical to that suggested in *Estrada, supra*, 11 Cal.4th at page 578—to further define this phrase when giving CALCRIM No. 540B. Contrary to Williams's claim, the instruction does not require the additional component—"encompass[ing] a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions"—to be accurate. The instruction, as given, subsumes this additional definition. And the omission of this additional language did not render the modified CALCRIM No. 540B a misstatement of the law. Instead, the reckless-indifference-to-human-life standard as defined by the trial court here in its instruction was correct and was one the jury may reasonably have been expected to understand without further amplification. Williams cites no authority holding otherwise.

The context of the whole trial record and counsels' arguments to the jury as to the *Clark* factors on reckless indifference to human life also show no prejudice from the omission of Williams's newly added component. There was evidence that Williams, having previously killed Wilkerson with the same gun used in the Pryor killing and having testified that she and Bean jointly owned the gun, provided the same gun to Bean for use in robbing Pryor and knew the gun would be present

62

during the attempted robbery or burglary.  There was also evidence that Williams was involved in planning the robbery or burglary as Doxy, a friend or customer of Pryor, was used to set up the ruse of a drug-buy; Doxy, Williams, and Bean arrived together at the motel and proceeded directly to Pryor's room, with Doxy gaining entry by knocking and responding that it was she, a friend and not a foe, at the door and with Bean hanging back with the gun until Pryor opened the door.  There was also evidence that Williams, present in the room, threatened Sandra Pryor and restrained her against the wall behind the door while Bean pushed on it and entered the doorway with the gun, inhibiting Sandra Pryor's ability to assist her husband in shutting the door.  There was also evidence that Williams fought with Pryor after Bean took the first shot through the door, increasing the possibility of violence and death and inhibiting the Pryors' ability to summon aid.  And then there was evidence of Williams's flight from the scene with Bean, leaving Pryor, bloody and face down on the floor, and Williams's immediately planned execution of Doxy with the same gun to eliminate her as a witness.

Williams's counsel, for his part, argued there was no reckless disregard of human life present because, according to her testimony, she had only gone to Pryor's motel room to defraud him by giving him counterfeit money in exchange for drugs, and when he discovered the scheme and attacked her, Bean showed up to defend her, and they escaped.  This, counsel argued, fell short of the standard for reckless disregard, which he described to the jury as: "Somebody's likely to die in what I'm about to do [and] I don't care."  It was more like someone "might die," which would not be enough for reckless indifference.

63

As argued by respondent here, Williams's theory of the case as to the Pryor murder was not that she had participated in an armed robbery gone bad but still lacked the mens rea of reckless indifference to human life. It was, rather, that all she did was try to buy drugs from Pryor with fake bills and without knowing Bean would use the gun—a situation presenting a low likelihood of risk to human life even if she were a major participant in that plan. When the plan failed, Pryor attacked her first and she was only able to escape once he had been incapacitated. On this argued theory, and in the context of the entire instructional charge, Williams's additional language—that she "personally harbor[ed] a willingness to kill to achieve the goal of the target offense, even if [she did] not specifically desire that a death result[] from [her] action"—would not have made a difference. The jury's verdicts showed they did not believe her version of the events of Pryor's murder and were not persuaded by counsel's argument on that evidence of the absence of reckless indifference.

D.      *Unauthorized Sentence Re Imposed but Stayed Five-Year Prior Enhancement Under Section 667, Subdivision (a)(1)*

The trial court imposed but stayed two five-year sentence enhancements for a prior conviction under section 667, subdivision (a)(1) in connection with the two murder counts 1 and 4. Williams contends this was an unauthorized sentence and that these two five-year enhancements should instead have been stricken. The People concede the error.

The argument flows from the legislative enactment of Senate Bill No. 1393 (2017-2018 Reg. Sess.), effective January 1, 2019, which amended sections 667, subdivision (a) and 1385 to provide trial court discretion to strike enhancements for prior felony convictions. (Stats. 2018, ch. 1013, § 1.) But there is no

64

statutory authorization for the trial court to impose but stay punishment for an enhancement rather than striking it, "at least, when the only basis for doing either is its own discretionary sense of justice," as it appears here. (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) Rule 4.447 of the California Rules of Court provides authority for imposing but staying an enhancement, but this rule applies only "when 'an enhancement that *otherwise* would have to be either imposed or stricken is barred by an overriding statutory prohibition,' " a circumstance not present here. (*People v. Bay* (2019) 40 Cal.App.5th 126, 139.)

Although Williams did not object to the court imposing but staying the two five-year enhancements, this aspect of the sentence is unauthorized and is reviewable on appeal in the absence of an objection below. (*See In re Sheena K.* (2007) 40 Cal.4th 875, 886–887.) It is clear from the court's entire sentence and its comments when addressing these two enhancements that the court intended not to impose additional punishment for them. We will therefore accept the concession and strike the two five-year enhancements imposed but stayed under section 667, subdivision (a)(1) in connection with counts 1 and 4. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand not required if record clearly indicates trial court would have exercised discretion and reached the same conclusion]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [remand to trial court not required when it would be an idle act].)

E.      *Correction of the Abstract of Judgment*

Williams validly claims the abstract of judgment requires correction in that it reflects a $10,000 parole revocation fine imposed but suspended under section 1202.45 that the court did not impose at all. As the court imposed two terms of life without

65

parole, it properly did not impose (and suspend) the parole revocation fine under section 1202.45 in addition to the $10,000 restitution fund fine imposed under section 1202.4, subdivision (d).  (*People v. Montes* (2021) 70 Cal.App.5th 35, 49 [parole revocation fine cannot be imposed when sentence is life without parole as it is authorized only when the sentence includes a period of parole].)

An abstract of judgment must conform to the oral pronouncement of judgment and a reviewing court is authorized to order the correction of a clerical error. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [court's oral pronouncement controls over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 186–187 [appellate court may order correction of clerical errors]; *People v. Rowland* (1988) 206 Cal.App.3d 119, 123 [reviewing court has authority to correct clerical errors in minute order and abstract of judgment].)

We accordingly direct correction of the abstract of judgment in this respect in our disposition.

## IV.   DISPOSITION

We strike the five-year additional punishment imposed but stayed for the section 667, subdivision (a)(1) prior conviction enhancements attached to the murder counts 1 and 4.  We also strike the $10,000 parole revocation fine under section 1202.45 from the abstract of judgment.  We direct the clerk of the trial court on remand to issue an amended abstract of judgment reflecting these corrections and to forward the same to the California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

WILLIAMS, J. [*]

We concur:

HOFFSTADT, P. J.

MOOR J.

---

[*] Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.